Case No. 15-1059, AT&T Corp. Petitioner v. Federal Communications Commission et al. Ms. Aguera for the petitioner, Ms. Citrin for the respondent, and Mr. Wright for the intervenors. Ms. Aguera for the petitioner, Ms. Citrin for the respondent, and Mr. Wright for the intervenors. Thank you, Your Honor. May it please the Court, Joe Guerra for AT&T Corporation. I'd like to reserve five minutes of my time for rebuttal. As the two dissenting Commissioners recognized, the order under review altered the clear meaning of the VOIP symmetry rule without going through notice and comment rulemaking. On three prior occasions, the Commission made clear that in VOIP over-the-top services, neither a LEC nor its VOIP partner provides the essential end-office switching function of taking a call off a high-capacity trunk and connecting it physically to the line that serves the call-in party. Yet when parties other than WIMAX Corporation argued to the Commission that dumping calls onto the Internet thousands of miles away from the call-in party constitutes the functional equivalent of end-office switching, the Commission abruptly changed course and pretended it had never previously addressed the question. So let me ask you, in the transformation order, the Commission begins. Today, the Commission comprehensively reforms and modernizes the universal service and inter-carrier compensation system to ensure, etc. And then it addresses these issues, why it's changing its position, what it's doing, and in paragraph 970 addresses some of these issues that are here. So why isn't that a signal to everybody, notice and comment, that the Commission's off on a new path, regardless of what it's done in the past? Our argument is that the transformation order set the meaning of the VOIP symmetry rule and made clear, for reasons I'd like to explain in greater detail, that there is no functional equivalent of end-office switching in a VOIP over-the-top phone call, and it's the declaratory order that changed the path that the Commission was on. So what do you do with paragraph 970? All right. Where the Commission says, regardless of whether the functions performed or the technology used would correspond precisely to those used under a traditional TDM architecture. Isn't that saying? No, Your Honor. All right. Why not? So if I could back up a moment, Your Honor. First of all, it might be helpful if I just explain how an over-the-top call works. If you have Vonage as your over-the-top provider and you're here in Washington, D.C., and a friend of yours calls you from Los Angeles, they dial your number, the phone system recognizes long-distance call and who the LEC assigned to that call is, and they transfer it to, say, San Francisco. At that point, the LEC that's partnering with Vonage and Vonage, one or the other, takes the call at a media gateway, converts it to an IP format, puts an IP address on it, and puts it on the Internet. And all the routing that is done at that point is like putting an address on the letter. Then the call is sent on its way over the Internet until it gets to the broadband provider that is serving you. And at that place, the broadband provider takes the call off of the high-capacity trunk and switches it directly onto a line that's serving you. Our position is that function, what the ISP is doing, is the end office switching. But the problem here is that in an over-the-top setting, the party that's actually doing that work of switching the call onto the line isn't the one that's getting paid for it. The interveners in the FCC have said that the person who just put the call on the Internet back in San Francisco gets to treat itself as though it's the person that took the call off the big trunk and put it on the line that runs to your home. And so the functional... I just want to try. To be honest, I don't understand the Commission's explanation. So maybe you can help me on it. It seems to me at least one reading of the declaratory order is the key aspect, or at least a key aspect of what an end office switch does, is to direct this call to the called party. It makes a critical step of that. And putting an IP address on this phone call, which emerges addressed to a regular phone number, is the equivalent of that. And it's done much more simply, much less technology, much less cost, but it is the equivalent of at least a function, and I guess they're saying a critical function, of the end office switch. Yes, Your Honor, but our point is that that is in fact not the critical function of an end office switch. And so if I could just describe the WIMAX decision briefly. WIMAX did what I just described as over the top. It just puts the address on as you described, puts it on the Internet, other people take care of making the call show up at your house. WIMAX said, we provide end office switching under the traditional definition of that term. And the commission said, end office switching requires, and they also said a virtual connection through the network is good enough to be a local loop, and that we provide the functional equivalent of end office switching because connection to a local loop is not the essence of end office switching. As I understand the commission's view of WIMAX, and also the intervener's view, insofar as the commission said those things in the first WIMAX order, it was dictum that the holding is much narrower. Your Honor, that is their position, but our— I'm putting this in a partial classification. Our point is that the reasoning that the WIMAX decision used necessarily addressed the functional equivalent argument because what they said was end office switching requires that you establish the point-to-point connection from the switch to the call-at-party. The call-at-party, that's taking the call off the high-capacity trunk and getting it to the call-at-party. And they said that is required for end office switching. That means that the essence of end office switching has to be the physical connection from that high-capacity trunk to the call-at-party. It can't be something else. And then when you get to the transformation order, as Your Honor noted, the commission says we've got a functional equivalent standard. You don't have to use traditional telephone technology. You can use IP technology if you're performing the same functions. But, it says, even under this rule, you can't charge unless you or your VOIP partner are performing the functions for which you're charging. And it cites to the very discussion I just described in the WIMAX order to illustrate a violation of that rule. It's a CF site, right? It is, Your Honor. But there's no other reason to be citing it. If all WIMAX stood for is a tariff interpretation case, why is the commission discussing it and illustrating the limits of its functional equivalence test? Is this the CF citation? It is, Your Honor. In this context, I think CF means that... In any context? Well, ordinarily... Here, we cite this, and we don't really know why we're citing it, but it's interesting. I'd like to... I assume there's a more precise reasoning employed in the CF citation, and here I would say that what's going on as a factual matter is it's a functional equivalence. They're necessarily rejecting a functional equivalence argument, but it's CF because it's decided under a different legal regime. It's at a time when you couldn't actually charge for what your VOIP partner did in any event, so it's not on all fours. One way to read WIMAX is it's simply an example of a filed rate doctrine. Your Honor... Here's your tariff, and you'd say the situation's changed and technology's overtaking it. Fine, but until you change the tariff, you can't take advantage of it. Yes, Your Honor, but the point is that doesn't make sense for why the transformation order would be citing it. If that's all it stood for, it has no bearing on what the limits of a functional equivalence test are. And, in fact, there's this back and forth about what does CF mean. WIMAX itself, within months of that transformation order coming out, came to the commission and said, Whoa, you just said... You cited the decision saying that when people read this, the very passage we're talking about, they're going to think we can't charge for access services on a functional equivalence basis because we don't provide the last-mile facilities, the facilities that take that call off the high-capacity trunk and switch it onto the line that reaches the called party. So they read it precisely the way we read it and are reading it because that is what it means, and they say, You've got to clarify, people are going to think that we can't charge, we don't do the functional equivalent, and the Bureau does not give them that clarification. So now the commission comes in and says, Oh, yeah, but the Bureau was asked a different question. They were asked the question, What happens? Is it enough to just give some of the numbers and perform some portion of the interconnection? That's a different question. That's ridiculous, Your Honors. The whole point of that inquiry was, The portion we don't provide is the last-mile facility. Please tell us that doesn't matter. And the commission refused to give that clarification. So if there was any doubt about the logic of WIMAX being cited with a CF site in the transformation order, it's eliminated by the clarification ruling. And that established what we think was clear and just confirms that in order to be providing the functional equivalent of end-office switching, you have to perform the function of taking a call off a high-capacity trunk and establishing the connection physically to the called party's premises. That is what uniquely occurs in the end-office switch. It doesn't occur in other switches, and that's one of the logical aspects of the commission's ruling, is they say call setup and call control and call signaling, those are the essence of end-office switching. But as we pointed out, and they don't respond to this point, all switches use the signaling network, and they are involved in call setup and call teardown. So the point, Your Honor, is the transformation order necessarily embodied an understanding of WIMAX that shows that the symmetry that you have to have under the symmetry rule is not is it a VoIP call, and all VoIP calls should be allowed to charge the same thing. It's what are the functions being performed, and are they symmetrical? And in a facilities-based call where you have Comcast, for example, we don't dispute that they are performing the function of an end-office switch. They take a call that reaches their node, which is based on the IP address. They know it's going to your premises, and they take it off the high-capacity line and they put it on the line that serves you. So when the commission says AT&T is trying to make it dependent on the type of technology and it has to stay traditional time-division multiplexing, that's nonsense. We acknowledge that in that very circumstance with Comcast, where they're using all IP technology, that that is the functional equivalent of end-office switching. And so, Your Honors, we think that in these circumstances, the transformation order read, particularly in conjunction with the clarification order, established a legislative rule, and the commission was not at liberty to change it without going through notice and comment rulemaking. So all of this chatter that I was discussing with you earlier is basically irrelevant? The commission is saying, you know, we're changing our whole approach in this area. In this sense, Your Honor, they're changing their whole approach. At the front end of the transformation order, they're saying, we're going to stop this whole access regime. We think it has a whole bunch of inefficiencies built into it, but while it still exists, we're going to let the people who provide VoIP calls and perform the same technology as the telephone providers to charge under the access regime when they perform the same functions. All right. So in the clarification order, the commission rejects IMAX's request because it views it as allowing this double billing. Well, it also refers to charging for functions that you're not performing. Right. Which is the core concern that the transformation order identified and cited IMAX as an example of. All right. So then we get to the declaratory ruling. And the commission, in that seventh footnote, says, we interpret the filings we address here to be premise that the LAC is seeking access and office charges also assign the calling party telephone number as reflected in the database of the NPAC. That doesn't respond to your concern? No, it doesn't respond to our concerns at all, Your Honor. The argument here is not that IMAX went in and said we should be able to charge because we provide the telephone number and some portion of the interconnection. Right. And that's, I believe, what they're referring to here. Right, right. And they're saying they don't rely on that. They say call signaling, call control functions are the functional equivalent. And our point is, again, all the switches do that. The end office switches function that's unique is it takes this call off the high capacity trunk and switches it onto the individual line. That is the unique work of an end office switch. And that has to be the core function that you can be compensated for when you do something equivalent using IP equipment and technology instead of traditional telephone technology. And we submit that that is what the transformation order cites it for as the proposition of you can charge when you're doing the same functions, but neither you nor the LEC is actually performing the function for which you're charging, points to IMAX, an example in which it said you're not providing end office switching if you don't connect the call to the line that serves the call-in party. Your Honor, I would like to reserve five minutes of my time, but if I could just finish my point about the notice and comment violation. Because we believe that the transformation order and the clarification order make clear that the functional equivalent of end office switching was not merely putting a call on the Internet thousands of miles away from the person who's supposed to receive it, though when the agency changed its view, it necessarily changed the meaning of a legislative rule. And the Commission makes the rather extraordinary argument in this case that as long as it doesn't modify the text, it could contradict squarely what was said in the transformation order. And we submit that this Court's precedent foreclosed that claim. Cases like Appalachian Power, National Family Planning and Reproductive Center, they say if you look at the contemporaneous explication of a rule and you determine its meaning, that's what the legislative rule means, and any subsequent deviation from it is an amendment and therefore must go through notice and comment rulemaking. If I could reserve the balance of my time, Your Honor. Yes, and we'll give you that five minutes if you want. Thank you, Your Honor. I just want to be clear, though, that in your view, in paragraph 970 in the transformation order, that that does not provide an adequate explanation. Your Honor, I'm not sure I understand what you mean by an adequate explanation. Well, you're saying when I originally read this, I thought 970 said, well, we're changing the system. We're not focusing on these facilities. We don't care, as it were, about the technology. No, Your Honor. So long as the functions performed by it or by its retail voice-over-internet partner, regardless of whether the functions performed by the technology correspond precisely to those used under traditional TDM architecture. Yes, and it's the next sentence that we are relying on. However, our rules include measures to protect against double billing, and we also make clear that they do not permit elected charge for functions performed neither by itself or its retail service provider partner, footnote 2028, CF-18TV-WiMAX. They are using the WiMAX decision to illustrate the limitation on the functional equivalence language that you just quoted. So they're not saying it doesn't – what they're saying is as long as you're doing the same thing as a telephone network, we don't care if the technology is different, if the formatting is different, but you can't charge if you're not doing the same thing. And the thing at issue here is in an end-office switch, the thing is taking it off the high-capacity trunk and physically connecting it to the line that reaches the call party. That doesn't happen in over-the-top. It does happen in over-the-top. It's done by the ISP, the broadband provider, who is not getting paid for it, and yet it's over-the-top partner saying we should collect that money as though they were performing that function. All right, thank you. Thank you, Your Honor. May it please the Court, I'm Sarah Citrin representing the FCC. And what AT&T is doing here is asking the Court to read meaning into the VoIP symmetry rule that isn't apparent on the text but that AT&T infers from outside sources. And AT&T's interpretation of those sources also asks the Court to ignore the text effectively of the Commission's decisions and read in meaning. You would accept the proposition that in interpreting the transformation order, we have to look at the words used in light of the way they've been used elsewhere in the past, elsewhere by the Commission, right? I mean, you talk about going outside the order. All interpretation of language goes outside the language. So I think that Judge Rogers is quite right. The transformation order was an entirely new inter-carrier compensation regime. Language, and to understand the language, we have to understand the context. I mean, if you reject that proposition, then we're in deep trouble. No, no. I accept that when you look at the language, you consider the context. I guess my response, what I meant to explain, was that I think the significant context here is that the Commission was for the first time creating an inter-carrier compensation access charge regime that would apply to VoIP calls. It had never done that before. It had always expressly reserved judgment about whether or how or to what extent access charges should apply to VoIP traffic. It used terms, including end-office switch. And as I understand it, the AT&T says that end-office switches perform, let's call them functions, A and B, as well as functions C through E, right? C through E being functions also performed by tandem switches. And the Commission replies to that saying, yeah, but they perform functions equivalent to C through E, so no problem. I think AT&T is pointing to the, is focused on how a call is transmitted. And it's true, for example, in the WIMAX decision, what the Commission said in that 2011 decision was that because there was a tariff that described a traditional architecture, it looked to the meanings of those terms. But the Commission went on to say what end-office switches do critically. In a traditional architecture. And the Commission said we are not deciding. AT&T brought claims. AT&T was arguing to the Commission. The services that WIMAX is performing are not functionally equivalent to switched access charges. The Commission dismissed those claims. It didn't reach them. It didn't decide them. And it also didn't decide. There was talk that would relate to those claims had it gone on to them. There is talk that AT&T thinks relates to those claims, but I don't think that, you know, one of you, if you want to call it dictum, that can't overcome the express language in the express terms of the order where the Commission said we're not deciding here functional equivalence. We're also not deciding whether if WIMAX had accurately described in its tariff the services it's performing, those services would be the proper subject for access charges. All we're deciding here is that, you know, akin to the filed tariff doctrine, Judge Randolph, you can only impose charges lawfully for what you have described in your tariff. To repeat, it also explained what it perceived to be the function of end office switches. I think it was explaining what it perceived to be the industry understanding in a traditional world of what end office switches does. And the Commission doesn't dispute that in a traditional architecture, an end office switch, one of its functions is to have this physical connection. But how a call is transmitted, you know, it reads the function out of functional equivalence. How a call is transmitted is more important than what is accomplished by doing that. The end office switch was responsible for all the call intelligence, for call setup, for managing the call, for knowing when the call ends. Those are the same functions that over-the-top VoIP providers perform, that facilities... I don't understand it. Call setup, you can have a separate charge for call setup, as well as a charge for an end office switch, which suggests distinct independence of the two functions. By that logic, there is a separate charge for the transport across the last mile. Which seems to be what AT&T is focused on here. I'm not... Well, as counsel points out, in this model, the over-the-top model, that's performed by the ISP. The transport is performed by the ISP, but I thought actually AT&T concedes that all of the call intelligence, that all of the delivery, I think he said, the call is everything necessary for delivery is accomplished before it reaches the ISP, and that's exactly right. And whether a competitive carrier, AT&T is focused on its brief on the plan necessary to accomplish certain things, but as the commission explained it, paragraph 31 of the declaratory ruling, and I think that paragraph 29 through 31 are really important for the court as far as how the commission understood the facts of what these different services accomplish. But a competitive carrier uses the same switching plant to perform all of the same functions when it's doing facility space VoIP or over-the-top VoIP or even traditional VoIP. So there is a difference in how a call moves across a network in these different technologies, and in a traditional architecture, there was a physical link required, but that isn't the essence of the functions of in-office switching. There was discussion also about paragraph 970, so I want to make sure that I... All right, but I want to be clear. I understand the emphasis on paragraph 31, and you're saying in addition we would need to focus on something to 39. I'm sorry, 29 to 31. That's where the commission is explaining what it understands and the functions that over-the-top VoIP providers provide and why there's no meaningful difference, that the only difference relates to transmission, the control of this in-office line, and that that is something I think I mentioned, the carrier common line charge. At footnote 112, that's what the commission explained. There's a separate charge for that transmission, but switching is these call intelligence functions, and that happens. The over-the-top VoIP provider and its competitive carrier partner provide all of those functions, not just some portion of them, the same way that would happen in a traditional architecture. And with respect to the language about the limitation that AT&T focuses on and that is discussed at paragraph 970 of the transformation order and also in the Bureau of Clarification order, I think both the Bureau of Clarification order in paragraph 970, footnote 2028, all of those track the language of the order and are accomplishing the same thing, which is they are in the face of this new framework that for the first time lets competitive carriers charge for some functions that they don't perform because their VoIP partners perform those functions. The commission is merely saying in making that change, we're not inviting double billing, the kinds of double billing problems that had been a problem in the past. You can't provide just some portion of an incumbent's full access services and charge the full benchmark rate for those services because if you did that, multiple carriers could charge the full rate for the same call. And at footnote 2028, there's the site to WiMAX, which I think illustrates one form of that kind of double billing protection, but also the string site goes on to cite level 3's comments. And if you look, especially at paragraph 23 of level 3's PN comments, which I believe are at 928 of the joint appendix, level 3 is explaining that its position is that the new inter-carrier access charge regime should apply to over-the-top calls as well as facilities-based calls, but there needn't be any concern that if the commission adopts a rule that has that scope, that there will be any problem with double billing because you can maintain this same requirement that the partnership this time, instead of just the carrier alone in the old regime, can only charge for the functions that they perform and they can't charge the full benchmark rate merely by performing some portion of what the incumbent offers. And that's what the clarification order was saying. I want to be very clear about the clarification order because AT&T points to, especially in its reply brief, many things that WIMAX was asserting about its services and its network architecture, but when the Wireline Bureau issued the clarification order, it was not considering any specific architecture. Those representations that AT&T is citing come from the 2011 case, the complaint case that originated in the Enforcement Bureau. What the Bureau was doing in the clarification order was not deciding the minimal functional equivalence for end-office switching. WIMAX may have wished that the commission would do that, but the commission didn't do it. The commission merely addressed some abstract language that it thought was overbroad. WIMAX was saying, please confirm that we can charge the full benchmark rate merely by performing some portion of the incumbent's access charge services. That could have enabled double billing. That was the commission's concern, as is clear on the face, I think, of paragraph 4 of the clarification order. And that tracks exactly what the commission was explaining in the footnote and in paragraph 970. In fact, the same requirement is in the cemetery rule itself. Council, the commission in paragraph 33 of the clarification order acknowledges AT&T's contention that what the commission is talking about or what's involved here fits more within a tandem switch than an end-office switch. Do you note that correctly? Of the clarification order? Yes. Okay. But you never, not you, the commission never answers that contention. There is no paragraph. And a sort of convenient way of... Which order are you looking at? Paragraph 33 of the clarification order. There is no paragraph 33. That's what I'm looking at. I'm trying to find it. Could it be the declaratory ruling? I'm sorry, the declaratory ruling. Oh, yes. Yeah, yeah. Well, I think... And it seems to me an effort to sort of map out that contention appears in attachment A to the Lawson letter 1027 of the joint appendix. I was wondering if you could just direct your attention to that. I think the commission's view is that in tandem switching, there isn't any of the call intelligence functions that happen in end-office switching. There isn't call management or call setup. There's no need to monitor a call. Is there some place where one could see that confirmed? My impression has been that, in the first place, call intelligence is largely provided by the SS7 network and all this is going through tandem switches. Well, as I understand tandem switching, it's transporting the call. It's doing what is necessary to deliver the call to the next stage in the transit path. In a traditional architecture, it would be to the end-office switch. But that's different from doing the call setup and management and monitoring that happens in end-office switching for the end user and that those functions aren't performed by the tandem switch. Although I should say, too, that my understanding is that competitive carriers, when we talk about tandem switches and end-office switches in this neighborhood architecture that AT&T describes in its briefs, that's something that the competitive carriers didn't. They had a different architecture even in the old world before VOIP. So there may be switches that can perform, that are able to transport a call, do both the function of transmitting a call to another switch and or instead sending it directly to the call destination and performing those intelligence functions. But you pointed me to 1027. Right. It's AT&T's effort to lay out its positions, but the end-office switch uniquely does. Let me just make that more clear. If there are switches that in one relationship perform four contributions and in another, specifically end-office switches, uniquely perform an additional two, it seems rather odd to say that if only the four more generically provided contributions are being performed, therefore it's an end-office switch or the functional equivalent of an end-office switch. Well, as I said, and I apologize for not being able to point you to a precise place, a discussion in the order that makes this point, but my understanding is that the tandem switches don't perform these call intelligence functions or that anyway when they're acting as tandem switches, as I said, there may be equipment that can perform many functions. But what the commission looked to is what are the essential functions that are being performed for the purpose of switching. Can you point me to some? Just let me ask one question. You pointed to some commission decision, which makes clear that these functions are not performed by tandem switches. I'm sorry, I can't point you to a commission decision. I would have thought that if the commission took on board the claim that it refers to in paragraph 33, it would want to respond to that. And response to that would seem to require showing what tandem switches don't do that is being done here. I mean, maybe it's out there, but I just have to say it's not in anything I've come across. It might have been better to discuss that at greater length. I think in response to your question, I think the AT&T in this page you've pointed me to is relying on the REO cases, which the commission did discuss in the order. And I think the commission's view of that decision is that it was specific to, it was talking about something that was a hallmark. Interconnection was a hallmark of an end office switch in a traditional architecture. But those decisions focus on the many call control functions. So on this chart of the commissions, the commission has explained in the declaratory ruling that they don't think that interconnection is the material, is the function of switching when you're looking at a wholly new architecture. I guess I'd come back to my earlier point that the commission is drawing a distinction implicitly, though not explicitly, between end office switches and tandem switches. But for that distinction to be meaningful, it seems to require a finding that tandem switches don't perform the functional equivalent, if I may use the term, of whatever it is that's at issue here. Well, I think that the commission was focused on trying to, in this respect, and it's clear from the disputes about the scope, the proper scope of the void symmetry rule that arose immediately after the rule's adoption, that the commission could have been clearer in a number of respects. But in the face of that uncertainty, AT&T has relied on this kind of connect the dots method of reading meaning into the language of the rule that isn't there. And I think their position that functional equivalence, when the commission has said, as Judge Rogers was pointing out, that the intent here was to adopt a rule that was not dependent on technology and modes of transmission, but that was focused on the functions and the call intelligence function being a central function  that notwithstanding the possibility that the commission could have been clearer, AT&T is asking the court to overlook express language in every source that it's pointing to as a basis for reading in this limitation into the scope of the rule. And I see my time... The language you're talking of is functional equivalent? Well, no, I think functional equivalent is, I think, a broad term that AT&T wants the court to read it narrowly. Why do they think the court should read it narrowly? Based principally on WIMAX 2011, on paragraph 970 and footnote 228 of the transformation order, and on the bureau clarification order. And in each case, arriving at the interpretation of those sources that AT&T wants the court to reach requires overlooking limiting language and context, as you were saying, Judge William, that the commission included in each of those orders. And the commission here had asked in the notice of proposed rulemaking leading up to the adoption of the VOIP symmetry rule whether it should draw a distinction between over-the-top VOIP and facilities-based VOIP. That was at paragraph 612 of the notice of proposed rulemaking. Having asked that question, the commission did not distinguish between those technologies in the text of the rule, and the commission at paragraph 940 of the transformation order, where it's explaining the scope of the new inter-carrier compensation regime that it's about to adopt, says it's focused on all VOIP PSTN traffic. And as the commission explained in the declaratory ruling, that means all traffic exchanged between the traditional phone network and IP network, and that phrase is broad enough to encompass both over-the-top VOIP and facilities-based VOIP. And if there are no further questions, I'll rest on that discussion in the briefs. Thank you. All right. So, counsel for interveners. Good morning. Good morning. Thank you, Your Honor. I'm Christopher Wright representing the interveners who are the LECs who partner with the VOIP providers in these cases. I think it might be useful at this point to actually focus on the language of what I think is the critical rule here, which is in the regulation adopted to define end-office access service. It's in page one of the addendum to AT&T's opening brief. And the point I want to make by looking at this is that, Judge Rogers, this regulation fully indicates the breadth of the rule, as does paragraph 970 of the 2011 order. And, Judge Williams, putting an IP address is, in fact, a key part of end-office switching, as you suggested as well. I'm sorry. What is it in the language? This is 903D that you're pointing to? Yes. Okay. 51.903D on the addendum, which defines end-office access service. There are three alternatives here, right? And the first alternative sounds a lot like legacy TDM service, sort of the old-fashioned network. I would note that it says the switching of access traffic at the carrier's end office and delivery to the called party's premises. In this connection, let me note that it doesn't actually say the linking. And a point I'd like to make in connection with this is the end-office access charge covers switching. It does not cover the cost of the port, which is the device that actually connects the switch to the loop. And, of course, end-office access service does not cover the cost of the loop. As the commission said in paragraph 8 of its order and note 27, those costs in the traditional network are collected by the common carrier line charge, not the switching charge. So this case has been argued as if we're trying to collect for switching and delivering when we hand it to somebody else to deliver. We're trying to collect for switching. And so if you look at the second and third definitions. Are you saying that when it uses service, it's encompassing switching and port? Switch and port. We are not seeking to collect for the porting function, and it's the porting function that is the function of actually connecting the switch and the loop, and we're not attempting to collect for the loop function, for the delivery function. We're attempting to charge for the access, the end-office access system, which the FCC has now defined very broadly, not just as in 1, but in 2 and 3. And 2 is very broad, and 3 is even broader. I got out of the title there. Pardon? It doesn't say end-office access switch. It says end-office access service. Is that intended, in your view, to reach beyond switching? Because then in 1, which, as you say, is the legacy system. So, Your Honor, if our service falls into any one of these, we're entitled to receive end-office switching. I understand. I just want to get your reading of Paragraph 1 and the heading. Right. So if you perform one of these three things, you're entitled to the access charge that we're seeking. And we think we qualify under 2 and 3, which are plainly broader than 1, which covers what AT&T does, and AT&T seems to think is the whole. I'm still trying to figure out whether the point that 1 has a clause ending in the word switch, and it has an and, and then delivery, and are you, to some extent, calling our attention to that  Well, let's look at 2, which is broader. Again, we think we are under 2. So 1 defines what AT&T does, and no one denies when it's acting as a lack of its end-office switching. 2 is the routing of IXE traffic to or from the call party's premises, either directly or via contractual or other arrangements with an affiliated or unaffiliated entity, regardless of the specific functions provided or the facilities used. This is an extraordinarily broad definition, just as paragraph 970 is quite broad. The commission in 2011 is very much changing the rules that govern these charges, and if our deference means anything, it means that the FCC can reasonably conclude that we're performing this service, or at least under 3, the functional equivalent of that service. Let me just ask you a question, and that is, you're saying that routing, as used in subparagraph 2, encompasses the process by which the called telephone number is transformed into an IP address. So, A, Your Honor, ultimately, so I'm sorry. The FCC has decided that this is under 3. I'm trying to make the point that this is very broad. The FCC did not say that this is under 2. It's very broad language. It could have said. The FCC made the easier call that 1 is traditional, 2 is a very broad new reading, 3 says functional equivalent. The FCC, it seems to me, is at its zenith in the amount of deference it gets in interpreting what this regulation means. And in the order, I'd like to point you to the place in the order where the commission actually describes what end-office switching is. It's paragraph 28 of JA 1148. And what it says is functional equivalent. It is certainly within the scope of its authority. It basically means, the way it defines it is that if you ensure that it gets to the called party's premises, you're doing the functional, and then manage the call, which no one disputes happens here, then you qualify for these switching charges. And, again, in this connection, let me note that AT&T, in its opening brief, footnote 13, says our deference is wrong. And in the reply brief, they say in a footnote that they're reserving the right to argue that to the Supreme Court. The author of our thought it was wrong, too. Unfortunately, he's no longer with us. Well, Your Honor, I just want to make the point that I think the lawyers understand that under our deference, the FCC wins here. And, you know, of course, this court applies our deference. Yeah. And if I could say a word about – Can I just ask a question about this paragraph 28, which is of great interest? A good deal of the activity of the functions described there, particularly in line 5 of the paragraph, call setup, conduct, and takedown, seem to be functions performed by switches that are not end office switches. Well, I mean, is that the case? What it says, though, is local switching ensures a connection from the transport across the network to the termination point phone device. The LEC transforms the call from TDM to Internet Protocol packets and then works with its VOIP partner to do exactly that, ensure a connection from the transport across the network to the termination point, the phone device. How it does it is different than how legacy TDM networks do it. But this is a functional equivalence test. It's not how you do it. It's whether what you're doing is functionally equivalent. And, Your Honor, you were pointing out that AT&T is actually arguing – AT&T doesn't say that we're not entitled to access charges. It says we're entitled to tandem switching access charges rather than end office switching access charges. Again, under our, Your Honor, I think there's no question that the FCC has to prevail in a claim that its regulation, its determination of what's functionally equivalent to determine that it's more like end office switching rather than tandem switching is just the sort of thing where it's technical matter where deference to the FCC ought to be at its zenith. If I could say a word about WiMAX. WiMAX is a filed rate case. I don't know why they did it, but the drafters of WiMAX's tariff simply misdescribed its service. If you look at page 7 of AT&T's reply brief, you'll see that they described it to do something they're not doing. They described it as if they're connecting loops to switches. And, of course, the FCC properly said, and, you know, this is as well settled as anything, you can't collect for what's not in your tariff. And, of course, in WiMAX it twice reserved its right to change its decision if, you know, if WiMAX came back with a new tariff. WiMAX didn't come back with a new tariff in the clarification rule. It came back saying, well, we do some portion of this. Isn't that good enough? And the FCC, faced with that broad proposition, said, no, there might be double billing. And one thing I would like to point out is that AT&T suggested that WiMAX is just like over-the-top VoIP and that WiMAX dumped calls on the public Internet. In fact, if you look at the description at JA885, paragraph 7, which is from the Commission's WiMAX order, WiMAX had a very strange configuration. Whatever it is, it's not traditional facilities-based or over-the-top VoIP. And rather than dumping the calls on the Internet, that paragraph tells us that WiMAX handed the calls to AT&T for delivery. And, you know, I don't know if the Commission was thinking of this when it said there's a double billing problem, but why perhaps AT&T's LEC could have collected access charges from AT&T's IXE in that case. But WiMAX is a strange creature, and what the Bureau said really has nothing to do with anything. You don't agree, or do you, that the entire transformation order of 900 and some paragraphs is a legislative rule? So, Your Honor, certainly the rules that are codified are the rules, and this Court frequently looks at the relevant explanation of those rules. Preambles. And takes them very seriously as explaining what the rules mean. And so I don't know that there's any practical difference when the Commission does that. Well, if there's an interpretation of the actual rules in the preamble to the rules, and the Commission changes its interpretation, is that an amendment of the rules? You know, I think I would need an actual example before, in order to describe that. For purposes of this case, of course, we don't, you know, we started with a rule. I just don't think it's at all, arguably, an amendment of the rule to define, you know, to define functional equivalent on a case-by-case basis. That seems like normal practice. Oh, one other thing I'd like to say about WiMAX. If AT&T were right and the Commission had decided that only facilities-based FOIT gets covered, and not OTT, not over-the-top, why wouldn't the Bureau have said, oh, well, this is over-the-top, you say, so it's not covered. Well, they didn't say that. And nobody was reading the rule that way in 2011, of course, except for AT&T. There are hundreds of IXEs, and they all read it the way my clients read it. And Verizon, a year later, decided to make the same argument as AT&T. But this hasn't come up. But there's no basis for reliance. AT&T's reliance wasn't reasonable here. Meaning of this rule was in doubt from the start. And it's, you know, been disputed for five years now. Anything further? Pardon, Your Honor? Anything further? No, Your Honor. Thank you. All right. Yes, counsel for petitioner. I believe the other counsel got a ---- Yes, of course. Thanks. There's a number of things I'd like to address. If you're assisting the court. I certainly hope that's what I will be doing. All right. First of all, on Judge Williams, I think you're absolutely right. There is no answer to the point that you posed about why the functions that a tandem switch are a subset of the end office switch. And so why is this just all lumped together? Counsel did not identify anything in the opinion in the declaratory ruling that, in fact, explained that anomaly. With respect to whether we're charging for the port, that's incorrect. If you look at ---- And to the extent the commission says, arguably, that tandem was in a world of physical facilities, and that's not what we're looking at now. So long as the function is provided, however, that's enough. And we don't care about, as it were, the actual transport. Yes, Your Honor, but the point here is what's the function? I understand. And the function can't be ---- they say it doesn't ---- the function of an end office switch, which we've explained, is to take the call up the high capacity line. That's the thing uniquely done there. They just say, well, the functions really call signaling and control. And our point is, but other switches do that, too. So that can't be the essential functional equivalent of end office switching. And so, Your Honor, you get to the argument where they say, well, yeah, but you're trying to charge for that line that connects to the home. And, in fact, we're not. It's true that the line port is a separate charge. But in the very 1997 order that they cite, paragraph 135, about where the line port cost has been moved to a different part of the accounting rules, in paragraph 135 they say, of course, the switching fabric, the switching function, the switching matrix, is still a usage sensitive charge. And that's exactly the thing we're talking about. We're talking about the call comes in on one line, it's got to go out on another line. How does that happen? It's the switching fabric in between that makes that connection. And that's the fundamental function of the end office. And it's not replicated in their services. When the commission says repeatedly you're only entitled to recover for the functions you actually perform, throughout this case I thought if I had numbers and I could see what they were related to, I would understand whether or not the charges were appropriate. But we don't have that as I understand it. So we're trying to understand this case in sort of an abstract way. And the commission keeps coming back and saying we're in a new world now. It really doesn't matter how you do this so long as you do it. And in any event, we're only going to allow you to recover for the services you actually provide. And if I could go back, Your Honor, I think this is the illustration that gets at exactly what you're talking about is the facilities-based VoIP call. It's a new world. It's IP. It's not TDM. It's different formatting. It's all different, exactly what the commission is talking about. And in that world, the function of taking the call off the pipe and connecting it through the switch to the call party does occur, and AT&T says we pay for that. We're not disputing that. That is the functional equivalent of end office switching. When you just put the call on the Internet and say, God bless, somebody else is going to make sure it gets to where it's going to go, and that's the ISP provider, that is not the equivalent of that essential function in the end office. And so when the commission ---- And that the commission could not reasonably interpret it in this. Well, the commission had previously made clear we submit through the transformation order, and our point, Judge Randolph, is not that every word in the transformation order is itself part of the rule, but certainly the discussion that we've been focusing on in paragraph 970 and footnote 2028, we say is either part of the rule under the APA provisions we've cited or it's necessarily the explication, contemporaneous explication, that establishes the meaning of the latter. And under either we win in terms of this being a legislative rule that's been amended. So then the commission comes back and they say, and this is all in their order, and I think this is all, with all due respect, a lot of hand-waving. They say, the LECs do the same thing in over-the-top that they do in facilities-based. Why shouldn't they get paid for that? And we don't dispute they do the same thing. The point is they don't do end office switching in either circumstance. Where end office switching occurs is in the facilities-based side by the facilities-based provider that takes the call off the trunk and puts it on the line. In the OT, over-the-top setting, that function is performed by an ISP that's not getting paid for it through access charges, and they want to collect that access charge as though they're doing it. That gets to the subparagraph D2 that Mr. Wright discussed. Commissioner Pye drops a footnote in this dissent and he says, nobody relies on the theory that that's the basis for recovering these charges, nor could they because that's about having an affiliated provider through a contractual arrangement with an affiliated provider. And when they put the call on the Internet and it goes on its merry way until some broadband provider puts it on the line that the call party's at, that ISP is the one doing that work, not some affiliated entity with the LEC. That's not its VOIP partner. They also say that there are two points that were made about the idea of the transmission. This is all about transmission. Well, that gets again to the difference between the line charge and the switching charge. We're not saying that we won't pay because it's the line port. We're saying we don't have to pay an over-the-top because there's no switching being done. When it comes to WiMAX, there's lots of discussion about it's a file tariff doctrine case. I haven't heard any explanation for why it's being cited to illustrate a fundamental limiting principle on functional equivalence. It just doesn't make any sense to say, by the way, you can't charge for functions you don't perform, even under a functional equivalence test, see a filed rate case. This is about functional equivalence. Then when it comes to the request for clarification, we're told they didn't actually talk about how the WiMAX didn't really talk about what it was doing. It wanted an answer to the question, what if we just give you the number and some portion of the connection? That's all we care about, finding out. But if you take a look at their request, on page two, this is JA-988, they say, the commission went on to say that you can't charge for functions you don't perform, and you cited the WiMAX case. And they say, judging from the paragraphs of the WiMAX order that it references, the commission might appear to be suggesting that if physical transmission facilities connecting the IXC, the long-distance carrier, and the VOIP service provider, are provided in part by one or more related ISPs, as is the case with WiMAX or over-the-top VOIP providers, then the LEC and its VOIP service partner are not performing the access function and cannot charge for it. That's crystal clear. We're worried that because we're not the last-mile facility providers, we don't get to charge under a functional equivalence regime. And the Bureau clearly understood this and said, yeah, that's right, you don't, because you can't charge for things you don't perform. Anything further? I'm sorry? Anything further? I'm just checking, Your Honor. With respect to the ‑‑ I'd like to make two other points. One is with respect to the hour deference. Our position obviously is not ‑‑ we're saying the rule is clear and couldn't have been amended, so all these arguments about hour, that's not responsive to our point. And then on the everybody else understood it the way we say, but the record doesn't support that assertion. There's just speculation that, in fact, the charges were assessed and they were paid, so that must mean that everybody understood except AT&T. My understanding, Your Honor, is that these bills come in and they don't isolate and say, here's the access charges for over-the-top VOIP calls, here's the access charges for facilities-based calls, here are the other access charges for traditional calls. My understanding from my client is they have to actually analyze the numbers to figure that out. So I readily concede that what I just said is not in the record, but nor is there anything in the record that explicitly says, we saw these charges, we understood what they were for, and we thought, you know what, the transformation order is pretty vague, we guess we've got to pay them. So with that, Your Honor, I have nothing further. Thank you very much. Thank you, Your Honor. We'll take the case under advisement and take a brief break.
judges: Rogers, Williams, Randolph